1
2
3
4
5
6
7
8

**United States District Court**
**For the Western District of Washington**
**Tacoma Division**

| | |
|---|---|
| John C. Dorff and Jocelyn P. Giammalva, individuals,<br><br>                    Plaintiffs,<br><br>Vs.<br><br>The City of Centralia and Centralia Police Department,<br><br>                    Defendants. | No.<br><br>**Complaint for Damages**<br><br>Jury Trial Requested |

Plaintiffs John C. Dorff and Jocelyn P. Giammalva, through their attorneys, Beck Chase Gilman PLLC, allege:

## I. Parties

1.1. Plaintiff John C. Dorff (Dorff) was a Washington resident at all relevant times.

1.2. Plaintiff Jocelyn P. Giammalva (Giammalva) was a Washington resident at all relevant times.

1.3. Defendant City of Centralia ("the City") is a municipality within Lewis County, Washington.

1.4. Defendant Centralia Police Department ("the Department") is a governmental law enforcement entity and operates in the City of Centralia.

Complaint – 1 of 11



## II. Jurisdiction & Venue

2.1. The United States District Court for the Western District of Washington has jurisdiction over this matter under 28 U.S.C. § 1331 (Federal Question Jurisdiction) via 42 U.S.C. § 2000e *et seq*. (Title VII), 29 C.F.R. § 1614.407 (Title VII regulatory framework), 42 U.S.C. §§ 12101, *et seq*. (Americans with Disabilities Act), and other applicable federal laws.

2.2. Venue is proper in the Tacoma Division pursuant to Western District of Washington Local Civil Rule 3(e)(1) because Defendants operate in Lewis County, Washington, and the acts and omissions described in this Complaint occurred in Lewis County, Washington.

## III. Facts

3.1. Plaintiff Dorff is a 45-year-old male.

3.2. Plaintiff Giammalva is a 28-year-old female.

3.3. Dorff and Giammalva were employed by Defendants at all relevant times.

3.4. Dorff and Giammalva performed their duties in a satisfactory manner.

3.5. Dorff's employment as a Police Officer began with Defendants in or around April 2016.

3.6. In or around 2018, Dorff was selected to be a SWAT operator.

3.7. In or around 2018, Dorff had a major surgery performed around his face and neck area. As a result, Dorff's medical provider advised him not to shave this area.

3.8. Dorff provided a note from his medical provider to Defendants regarding his medical condition.

3.9. In or around January 2019, Dorff was promoted to the rank of Sergeant.

3.10. Giammalva's employment as a Police Officer began with Defendants on or around April 15, 2019.

3.11. Department Chief of Police Stacy Denham (Denham) subjected female employees to disparate treatment, including but not limited to, speaking to them in a condescending manner,

assigning them to administrative tasks, and applying different standards and practices toward female employees.

3.12. Giammalva, as a female officer, experienced differential treatment from Denham beginning in or around July 2019.

3.13. For example, in or around the summer of 2019, while Giammalva was still on probationary status, Denham called Giammalva into his office for a meeting. During that meeting, Giammalva addressed Denham using "sir" and "chief," as she would any supervisor. However, Denham stated "I don't use titles with you, just call me Stacy." Denham required male officers to address him with the proper formal titles, but attempted to insist on a more casual relationship with Giammalva.

3.14. As another example, on or about July 31, 2019, when Giammalva called out of work to attend to a personal emergency, Denham sent an officer to Giammalva's home to verify her whereabouts. This was not a regular practice and, upon information and belief, was not done with male officers, including those on probationary status.

3.15. Additionally, on or about December 2019, Giammalva's grandmother died. While Giammalva was with her family, watching her grandmother's body be carried away on a gurney, Denham personally arrived at Giammalva's family home, unannounced. While Giammalva and her family stood grieving, Denham questioned Giammalva about when she would be returning to work.

3.16. In or about February 2020, Dorff successfully completed his probationary period as Sergeant.

3.17. In or about April 2020, Giammalva successfully completed her probationary period as a Police Officer.

3.18. Dorff is legally separated from his wife.

3.19. On or about August 20, 2020, an Internal Affairs investigation was initiated by Denham and Interim Commander David Clary (Clary) into reports of alleged inappropriate workplace contact between Dorff and another officer, Sergeant Patty Finch. In reality, this investigation was launched because Dorff and Finch, peers within the Department, were dating. Although there was no policy against this and although Dorff and Finch did not interact in a romantic manner at work or around colleagues, Denham and Clary did not like their relationship.

3.20. On August 26, 2020, during a conversation in which Denham was notifying Dorff of the Investigation, Denham ordered Dorff to shave his face. This was despite the fact that Dorff had been exempt from shaving his face for the previous two years due to his 2018 surgery and ongoing medical condition, which Defendants had knowledge of.

3.21. Dorff was required to provide additional medical documentation regarding his medical condition.

3.22. In or about the fall of 2020, Giammalva was interviewed as a witness in the investigation about Dorff and Finch, and opposed what she reasonably believed to be unlawful treatment.

3.23. On September 23, 2020, a leadership meeting for the Department was held. Dorff, Denham, Finch, Clary, and 6 other members were in attendance.

3.24. During this meeting, Clary, an Interim Commander at the time, made homophobic comments. Denham was present for but did not attempt to stop or address Clary's language. Clary was not officially reprimanded or disciplined for the incident.

3.25. On or about November 6, 2020, the investigation regarding Dorff was concluded and Dorff received a written reprimand in his file. Dorff grieved this reprimand.

3.26. In or about February 2021, Department members filled out annual performance evaluations. On the evaluation, there are various statements that the employee completing the

evaluation has the option to agree with by signing their initials next to each statement. In filling out his evaluation, Dorff declined to initial two of those statements: first, that he was not aware of "others that have been the subject of unreported harassment," second, and that he "recognize[s] the Chief of Police and City's commitment to maintain a safe and harassment-free environment." Given his experiences with Department leadership, Dorff did not feel comfortable acknowledging either of those statements.

3.27. On or about March 3, 2021, Dorff's written reprimand related to his relationship with Finch was successfully overturned and the written reprimand was removed from his file.

3.28. On or about March 4, 2021, the City's HR Director and Risk Manager, Angie Stritmatter (Stritmatter) requested that Dorff submit a City Harassment Claim form based upon his written evaluation. Dorff did as requested and reported the homophobic comments made by Clary and the behavior of Denham during the September Meeting.

3.29. Also in or about March 2021, Dorff was notified that he did not receive a firearms instructor position he applied for. Dorff was further informed that Clary stated Dorff was "not a team player," which was a factor in the decision not to give him the firearms instructor position.

3.30. The City initiated an investigation of Denham in relation to the claims of harassment. In this investigation Denham was also investigated for disparate treatment of female employees and inappropriate personal communications with subordinate employees.

3.31. In or about May 2021, Clary contacted Dorff to advise him that Dorff would "probably be demoted."

3.32. In or about June 2021, Denham notified Dorff that Dorff was being "laid off," and should report to work as an officer rather than a sergeant. Shortly thereafter, all the other sergeants received a pay raise. Because of his recent "layoff" to the lower officer position, Dorff did not receive this raise.

3.33. On or about June 26, 2021, Dorff was the officer in charge when he and three other officers received a third-party call about a potential domestic violence dispute. Giammalva was one of the other three officers. It was around lunch time for their shift, and the four officers were having lunch together while staying available for any calls that came through. The officers prepared to respond to the potential domestic violence call.

3.34. Within about a minute or so of that first call, another call came through that the potential victim of the domestic violence dispute went down to her car and was leaving the scene. Dorff, Giammalva, and their other two coworkers had an understanding at that time that the issue was resolved because the alleged victim was able to go down to her car and willingly leave.

3.35. In the meantime, the four officers continued their lunch break. The officers then received another call about the same potential domestic violence issue and immediately dispatched to the scene.

3.36. When the officers arrived on the scene, Giammalva spoke to the young woman who was the potential victim of domestic violence. The young woman insisted to Giammalva that she was fine. Giammalva had by then been notified that a protective order was in place against the young woman's boyfriend, the alleged perpetrator of domestic violence. Giammalva asked the young woman whether her boyfriend was there at the apartment and the young woman responded that he was not. However, the young woman's boyfriend then jumped out the window of the apartment. The officers arrested the young woman for aiding in criminal activity.

3.37. Giammalva completed a contemporaneous written report of the June 26, 2021, call, and submitted it according to department policy and procedure.

3.38. Almost two weeks later, on or about July 7, 2021, the young woman's mother allegedly posted a comment on a community Facebook page stating she was upset by the response of the Centralia Police Department during that June 26 call wherein her daughter was arrested.

3.39. Based on this Facebook post, an investigation was launched into the June 26 call. However, none of the officers were suspended pending that investigation, and Dorff and Giammalva continued working their normally scheduled shifts.

3.40. On July 16, 2021, Dorff received a letter from City Manager Rob Hill stating he was "extremely disappoint[ed], to put it mildly" that Dorff had reported harassment in the workplace.

3.41. Also in July 2021, Denham confirmed that Dorff was demoted, not laid off.

3.42. Under the Collective Bargaining Agreement (CBA) with the Department, both demotions and layoffs are done in order of seniority. At the time Dorff was demoted, there were no less than 10 officers junior to him who would have been demoted before Dorff based on seniority under the CBA. However, Defendants demoted Dorff outside of established policy and practice.

3.43. In or about mid-August 2021, a leadership meeting occurred, which Dorff was not invited to attend. In his previous position as sergeant Dorff would have attended this meeting.

3.44. In or about late-August 2021, HR Stritmatter notified Dorff he would receive a 17% reduction in pay commensurate with his demotion. Dorff was also removed from the supervisor overtime callback list, precluding his ability to work overtime as he did in his position as sergeant.

3.45. On or about September 22, 2021, Dorff received a notice of anticipated disciplinary action for alleged use of profanity in the workplace. Other officers and management level employees regularly used similar language in the workplace without receiving discipline.

3.46. On or about September 29, 2021, three months after the June 26 call, Dorff and Giammalva were placed on administrative leave related to the investigation into that call. The notice placing the officers on leave stated: "No final decision will be made until after this pre-disciplinary meeting has taken place." Their meetings were scheduled for October 14, 2021.

3.47. On or about October 11, 2021, Dorff sent a communication to Defendants stating:

> I write this statement in preparation for my October 14, 2021 Loudermill Hearing. In the past seven months, I have been the subject of more disciplinary action than in the 18 years of my career as a police officer combined.
>
> In March 2021, I reported Chief Denham for discriminatory behavior after being asked to give my honest feedback by HR. Around the same time, it became known that I engaged in protected activity by utilizing the union process to have an improper reprimand removed from my file.
>
> Ever since, I have been the target of retaliation by management, which I'm afraid is culminating in the department creating justification to fire me. First, I was threatened with a demotion in May, further threatened with a layoff in June, and then actually demoted in July of 2021. My demotion resulted in a 17% pay cut.
>
> On September 22, 2021, I received a Notice of Anticipated Disciplinary Action for alleged use of profane and obscene language while on duty. The use of profanity is an extremely common part of the culture in our department and our line of work, and I have not seen anyone else in our department disciplined. Also, the alleged profanity I used was during what I thought was a peer counseling session, where I was reporting my frustrations with the retaliation I am experiencing at work. I am still awaiting the disciplinary decision based on my alleged use of profanity.
>
> Then, on September 30, 2021, I received another Notice of Anticipated Disciplinary Action for an alleged issue with responding to a call back in June 2021. This notice says I am facing discipline up to and including termination from employment. These recent write ups appear to be further retaliation based on my protected activity of reporting discrimination in the workplace and grieving an improper reprimand.
>
> After being hired in 2016, I was named Officer of the Year in 2017, Traffic Safety Officer of the Year for Lewis County in 2017 and 2019, have received three Lifesaving Awards, was selected to be a SWAT Operator in 2018, and in 2019 was promoted to Sergeant. I have not had any negative performance reviews in all of my 18 years of my career as an officer. Now, after engaging in protected activity, it seems I am facing endless justifications from within the department to end my career.
>
> I look forward to discussing these issues more during my October 14, 2021 hearing.

3.48.   The next day, Giammalva sent a communication to Defendants stating:

> Good Morning,
>
> I am providing this email and its attachment in preparation for the October 14, 2021 meeting and in opposition to practices in violation of the Washington Law Against Discrimination, RCW Ch. 49.60 and other anti-discrimination laws. I have been the target of retaliation for protected activity at work. I have previously made it known that Chief Denham treats female officers differently, including when he was Assistant Chief and now in his role as Chief. Aside from gender-based discrimination, Chief Denham has been reported for homophobic commentary and the use of profanity in the workplace. In fact, several members of our department use profanity freely, including broadcast over the radio, but are not disciplined. But if you have reported Chief Denham's behavior or are otherwise outspoken about issues of discrimination or retaliation in the department, you are targeted for discipline over the same behavior.
>
> Ever since I was called as a witness in an investigation about Officer John Dorff, I have been specifically targeted for retaliation. As a witness in that investigation, I was asked to discuss issues of Officer Dorff and Sergeant Finch's personal and sex life, focusing on their activities outside of work, which I expressed I felt very uncomfortable about. I was then compelled to participate in a second interview where Chief Denham required me to answer questions I had previously objected to.
>
> I am currently under investigation for an incident from June 2021 and am facing discipline up to and including termination. I do not believe that the allegations against me justifies my termination of employment and am providing the attached statement to address the allegations.
>
> However, it is critical to note that I have no previous formal complaints in my personal file, including anything regarding these specific allegations. Terminating my employment based on the allegations from the June 2021 call violates the progressive discipline process and is very clearly retaliation for my protected activity, particularly as a female officer.
>
> Thank you,

3.49. Defendants did not respond to either Dorff or Giammalva's communications regarding their concerns that they were being retaliated against for their protected activity.

3.50. On November 4, 2021, both Dorff and Giammalva were fired outside of the established progressive discipline policy.

3.51. Since being terminated, Dorff and Giammalva have continued to face retaliation from Defendants, which has interfered with their ability to obtain comparable employment post-termination.

3.52. Defendants discriminated against Dorff and Giammalva in the terms and conditions of their employment.

3.53. Dorff and Giammalva opposed this discriminatory conduct and engaged in protected activity under federal law.

3.54. Dorff and Giammalva suffered retaliatory adverse actions that would dissuade a reasonable person from opposing such discriminatory conduct.

3.55. Dorff's medical condition and his protected activity were substantial or motivating factors in his termination.

3.56. Giammalva's gender and her protected activity were substantial or motivating factors in her termination.

3.57. As a result of Defendants' wrongful, unlawful, discriminatory, and retaliatory actions, Dorff and Giammalva have suffered both general and special damages, including but not limited to lost wages, benefits, emotional distress, and humiliation.

### IV. First cause of Action: Discrimination and Retaliation – ADA and Title VII

4.1. Plaintiffs reallege and incorporates all allegations above.

4.2. The Americans with Disabilities Act (ADA) and Title VII prohibit discrimination and retaliation in the workplace. *See* 42 U.S.C. § 12101-02; 42 U.S.C. § 2000e *et seq*.

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104

4.3. Defendants' willful and unlawful conduct described herein discriminated against Dorff based on his disability. Dorff engaged in protected activity and Defendants retaliated against him for such activities in violation of federal law.

4.4. Defendants' actions constituted discrimination and retaliation against Dorff in violation of federal law including the ADA, 42 U.S.C. § 12101-02 (*see also* 29 C.F.R. § 1630.8), and Title VII, 42 U.S.C. § 2000e *et seq*.

4.5. Defendants' willful and unlawful conduct described herein discriminated against Giammalva based on her gender. Giammalva engaged in protected activity and Defendants retaliated against her for such activities in violation of federal law.

4.6. Defendants' actions constituted discrimination and retaliation against Giammalva in violation of federal law including Title VII, 42 U.S.C. § 2000e *et seq*.

4.7. Plaintiff John C. Dorff filed a complaint of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) as Charge No. 551-2022-01828. On June 21, 2022, the EEOC issued a Right to Sue letter.

4.8. Plaintiff Jocelyn P. Giammalva filed a complaint of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) as Charge No. 551-2022-01870. On June 21, 2022, the EEOC issued a Right to Sue letter.

4.9. Under the ADA and Title VII, Dorff is entitled to recover actual and compensatory, economic and noneconomic, special and general damages, liquidated damages, and punitive damages, as well as attorneys' fees and litigation expenses and an enhanced award to offset any negative tax consequences.

4.10. Under Title VII, Giammalva is entitled to recover actual and compensatory, economic and noneconomic, special and general damages, liquidated damages, and punitive

damages, as well as attorneys' fees and litigation expenses and an enhanced award to offset any negative tax consequences.

## V. Prayer for Relief and Jury Demand:

Plaintiffs reallege and incorporate all allegations above and ask the Court for the following relief:

A. For judgment against Defendants for all actual and compensatory, economic and noneconomic, general and special damages as allowed by law;

B. For all injunctive, declaratory, or punitive relief as authorized by law, including but not limited to liquidated, double, or other damages;

C. For all costs, expenses of litigation, interest, and reasonable attorneys' fees as allowed by law;

D. For an enhanced award for federal tax consequences to make them whole;

E. For trial by jury; and

F. For any and all other relief as the Court deems just and equitable.

Dated September 16, 2022.

Beck Chase Gilman PLLC
By: /s/ Janelle E. Chase Fazio
    Janelle E. Chase Fazio, WSBA No. 51254
    janelle@bcglawyers.com | D 253.289.5136
By: /s/ James W. Beck
    James W. Beck, WSBA No. 34208
    james@bcglawyers.com | D 253.289.5122
By: /s/ Eric D. Gilman
    Eric D. Gilman, WSBA No. 41680
    eric@bcglawyers.com | D 253.289.5108

Attorneys for Plaintiffs John C. Dorff and Jocelyn P. Giammalva

Beck Chase Gilman PLLC
705 S. Ninth St., Suite 305
Tacoma, WA 98405
253.289.5104